733 A.2d 464

JOSEPHINE F. LANG, PLAINTIFF–RESPONDENT, v. ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF NORTH CALDWELL, DEFENDANT–APPELLANT, AND ROBERT CA-LABRESE, DEFENDANT.

Argued February 16, 1999—Decided July 19, 1999.

*Donald M. Ross* argued the cause for appellant (*Dolan and Dolan,* attorneys).

*Nicholas Albano, Jr.,* argued the cause for respondent.

The opinion of the Court was delivered by

STEIN, J.

This appeal involves a conventional "c" variance application to permit construction of an in-ground swimming pool with an insufficient southerly side yard setback, an insufficient rear yard setback, and land coverage of the property's rear yard consisting of 14.17 percent rather than the 10 percent permitted by ordinance. The North Caldwell Board of Adjustment (Board) granted the variance under both subsections c(1) and c(2) of *N.J.S.A.* 40:55D–70. The Board determined that the applicant's need for the variances was occasioned by the unusual narrowness of the applicant's lot, combined with the pre-existence of a paved driveway and garage along the northerly side of the property's rear yard, and that those unique attributes of the property constituted exceptional and undue hardship within the meaning of the statute. The Board also determined that the applicant's proposed replace-

ment of an existing above-ground pool and deck with an in-ground pool constituted an aesthetic and safety enhancement to the property that outweighed any detriment. Concluding that the statutory negative criteria also were satisfied by the applicant's proofs, the Board granted the variances, imposing conditions relating to fencing and landscaping along the rear lot line.

The property owner to the rear of the applicant's lot challenged the grant of the variances. The Law Division upheld the variances. The court noted that, although the applicant's *pro se* presentation to the Board was not as comprehensive as it might have been, the record demonstrated that "by virtue of the narrowness of the lot it's almost impossible ... to meet the side yard and rear yard restrictions," concluding that absent any showing of arbitrariness the court would not substitute its judgment for that of the Board. In an unpublished opinion the Appellate Division reversed, observing that to the extent the length of the proposed pool was influenced by the desire to accommodate a diving board, the purported need for a diving board did not constitute a hardship sufficient to support a variance under subsection c(1) of the statute. The court also rejected the Board's finding that the aesthetic and safety benefits derived from replacing an above-ground pool with an in-ground pool were sufficient to support a c(2) variance. Concluding that the Board's action was arbitrary, the court reversed the judgment of the Law Division.

We granted certification, 156 *N.J.* 411, 719 *A.*2d 643 (1998), and now reverse the judgment of the Appellate Division and reinstate the grant of the variances sustained by the Law Division.

I

As is often the case in variance appeals, a detailed understanding of the relevant facts is an indispensable prerequisite to the correct application of the controlling legal principles. The applicant, Robert Calabrese, was an owner of a one-family residential dwelling at 2 Hillcrest Place in the Borough of North Caldwell (Borough) that he acquired in 1990. The zoning ordinance re-

quired lots in that zone to have a minimum width of 100 feet, minimum depth of 125 feet, and minimum lot size of "15,000 square feet within the first ... 150 feet." Calabrese's property was nonconforming when he acquired it. It was sixty feet wide at the street line and slightly less than seventy-eight feet wide at the rear lot line. At its deepest point the property measured 140.71 feet from front to rear along the southerly sideline, and 132.13 feet along the northerly sideline.

At the time of the application Calabrese's property was improved with a two-story residential dwelling. The rear yard contained an above-ground swimming pool with approximate dimensions of twenty-six feet by fifteen feet (390 square feet) constructed behind an irregularly-shaped deck with dimensions of approximately twenty-six feet by twenty feet (520 square feet). In addition, extending from the front of the property along the northerly sideline was a driveway, twenty-two feet in width at its widest point, leading to a concrete block garage in the northeast corner of the rear yard. As the Board's resolution notes, the paved driveway and garage occupy "substantially all of the left side yard and a substantial portion of the rear yard."

Calabrese submitted an application and plan to the Board seeking to remove the existing above-ground pool and the adjacent deck, and to construct an in-ground pool thirty-five feet long and eighteen feet wide, described by the applicant as a "stock size" pool with a vinyl liner the dimensions of which constituted the minimum size pool that could accommodate a diving board. (We note that the size of the proposed pool (630 square feet) appears to be fairly typical of the size of in-ground pools installed at single-family residential properties. See Letter from Tom Casey, Vice-President Sales, Anthony & Sylvan Pools, to Stephen W. Townsend, June 9, 1999 (stating that based on construction of 188 pools in northern New Jersey from October 1, 1998 to present, the average water surface area of all finished pools is 654 square feet)).

According to Calabrese's proposed plan, the in-ground pool would be set back approximately thirty feet from the northerly sideline, and separated by about seven and one-half feet from the concrete block garage. At its nearest point to the southerly sideline, the pool would be set back eight feet from the property line. The northerly end of the pool would be set back fifteen feet from Calabrese's rear property line and the southerly end of the pool would be nineteen feet from the rear lot line. Annexed as Appendix A to this opinion is a survey of Calabrese's property prepared by Alfred J. Clark, Inc., and depicting the proposed in-ground pool on Calabrese's property.

Calabrese sought variances from the provisions of Section 107–22B(2)(a) of the Board's zoning ordinance, which requires that in-ground swimming pools be set back twenty feet from each sideline and from the rear lot line, and limits the area of the pool to ten percent of the area of the rear yard. The Board calculated the area of Calabrese's rear yard to be 4446 square feet, and determined that the area of the proposed pool (630 square feet) would occupy 14.17 percent of the rear yard area.

Concerning the side yard variance, the plan demonstrated that because of the location of the existing garage and driveway it would not be possible to move the pool any closer to the northerly sideline and thereby increase the setback from the southerly sideline. Calabrese testified that an evergreen hedge about fourteen feet high extended along the southerly sideline and provided a substantial buffer from the adjacent properties. As revealed by an excerpt from the Borough's tax map submitted to the Board and depicting the neighboring lots, the two lots bordering Calabrese's southerly sideline front on Mountain Avenue and are situated so that their rear yards, not their side yards, abut Calabrese's southerly sideline. The houses on those lots are set back approximately 80 and 95 feet from Calabrese's southerly sideline and neither of the property owners of those lots testified at the hearing on the variance application.

Concerning the setback variance relating to the rear lot line, Calabrese testified that moving the pool any closer to the house could create a safety hazard for residents of the dwelling. He also testified that a six-foot-high stockade fence was located along the abutting rear property line of respondent Lang, the owner of the adjacent lot to the rear whose attorney appeared at the variance hearing in opposition to the application. Calabrese testified that there was existing shrubbery along his rear property line and that he contemplated adding additional shrubbery to create a visual buffer. Lang's property, with dimensions of 100 feet by 120 feet, fronts on High Point Place which is easterly of and parallel to Hillcrest Place. Lang's residence is set back approximately 38 feet from her rear property line.[1] At the hearing Board members pressed Lang's attorney to set forth the reasons for his client's objection to the variances sought, noting that the proposed in-ground pool would be less visible from Lang's property than the existing above-ground pool. Lang's attorney indicated that his client objected to the fact that the size of the proposed pool precluded its being installed in compliance with the provisions of the local zoning ordinance.

Except for Calabrese's request for a variance to permit construction of a six-foot fence, an issue not implicated in this appeal, the Board granted the requested variances. The Board required that the proposed pool be relocated to provide a conforming twenty-foot-rear-lot-line setback at the pool's southerly end and a sixteen-foot-rear-lot-line setback at the pool's northerly end. The Board required Calabrese to plant a hedgerow of evergreens along the rear lot line four feet high that would grow to and be maintained at six feet in height within three years. The Board prohibited overhead lighting of the pool and required that the pump and heater be installed inside the garage if feasible and, if

---

1 Although the record did not reveal the distance of Lang's dwelling from her rear property line or the distance of the dwellings on the lots abutting Calabrese's southerly sideline from their rear property lines, the Court was informed of those distances by counsel after oral argument.

not, at a location adjacent to the garage designated by the local construction officials.

In support of its grant of the variances, the Board noted that the applicant's property is exceptionally narrow and is one of the narrower and smaller lots in the R–2 zoning district. The Board observed that three of the five lots fronting on the easterly side of Hillcrest Place are substantially wider than Calabrese's lot and five of the seven lots on the other side of Hillcrest Place also are wider; that all of the lots on High Point Place, the street parallel to and easterly of Hillcrest, are substantially wider than Calabrese's lot; and that the lots in the neighborhood beyond Hillcrest and High Point are "substantially larger still." The Board determined that Calabrese's lot has been "substantially affected by subsequent R–2 district requirements that have established onerous limitations on owners of such properties [that] are notably smaller than subdivided lots of a later vintage," and that therefore the "development and redevelopment opportunities on the subject lot and others like it are correspondingly impeded." The Board concluded that because of the exceptional narrowness, size, and shape of the property and the location of the existing driveway and garage, the strict enforcement of the R–2 regulations relating to swimming pools would "severely limit and perhaps preclude the installation of any reasonably sized in[-]ground swimming pool in the rear yard of the subject property." The Board concluded that because of those unique conditions the strict enforcement of the ordinance would result in exceptional and undue hardship justifying the grant of the variances sought.

The Board also concluded that the variances could be sustained pursuant to subsection c(2) of *N.J.S.A.* 40:55D–70 on the basis that the removal of the existing above-ground pool and deck and its replacement with a new in-ground pool and installation of extensive landscaping was aesthetically preferable and more visually desirable to the community, noting as well that in-ground pools generally afford a safety advantage over above-ground pools.

Concerning the negative criteria, the Board observed that based on the proposed location of the in-ground pool, combined with the existing and contemplated landscaping,

> it would seem that neighboring views of the proposed redevelopment would be quite limited indeed. There are no homes that are so proximate to the subject rear yard that a view of the pool area would be experienced from the perspective of the home. Two of the adjoining properties on the right side of the subject property are improved with free-standing garages in the abutting rear yards of those properties. The property to the rear of the subject property is not improved in the vicinity of the subject property. Consequently, an adjoining property owner would have to walk to the subject property's boundaries to observe and therefore be significantly affected by the proposed redevelopment.

The Board expressed the view that the grant of the required variances appeared to pose no threat of impairment to the surrounding area nor of any detriment to the public good. Accordingly, the Board concluded that the proofs also satisfied the negative criteria and therefore justified a grant of the variances.

Lang instituted an action in lieu of prerogative writ in the Law Division challenging the validity of the Board's action. Judge Weiss agreed with the Board's determination that the narrowness of the subject property rendered it "almost impossible ... [for the applicant] to meet the side yard and rear yard restrictions." Concluding that the Board's determination was based on adequate evidence in the record and was neither arbitrary, capricious nor unreasonable, the court sustained the grant of the variances.

A two-member panel of the Appellate Division reversed the judgment of the Law Division. In explaining its disagreement with the Board and the Law Division, the Appellate Division initially took note of a provision of the local ordinance that required a minimum rear yard setback of thirty feet for structures other than swimming pools. Noting that a conforming lot in the R–2 zone must have a minimum width of 100 feet, the court incorrectly concluded that "the swimming pool portion of [the] code contemplates that a pool in a fully conforming lot in the zone (i.e., one with a rear yard with a 30 foot depth and 100 foot width) must not exceed 300 square feet." The panel's error resulted from its assumption that the area of a lot's rear yard, for purposes

of compliance with the ten percent size limitation on swimming pools, could not exceed the product of thirty feet (the minimum rear yard setback for structures) and one hundred feet (the minimum lot width). However, as the Board's resolution expressly notes, the area of a lot's rear yard pursuant to the ordinance is "the yard extending across the entire width of the lot between the rear line of the principal building and the rear lot line." On that basis, the Board correctly calculated Calabrese's rear yard to occupy 4446 square feet, not 3000 square feet as the Appellate Division assumed. Thus, that court's review of the Board's action clearly was influenced by its incorrect assumption that the maximum permitted size of a swimming pool in the R–2 zone was 300 square feet.

The Appellate Division also assumed incorrectly that the entry steps to the pool and the eighteen square foot concrete pad for the pump and heater were to be included in the calculation of the swimming pool area. To the contrary, the ordinance imposing an area limitation contemplates calculation of only the area of the pool itself.

The court next inferred that the Board had granted a c(2) variance because it found no proof of hardship sufficient to support a c(1) variance. As noted, however, the Board's resolution determined that "hardship" had been established and granted the variance under both subsections c(1) and c(2). Without any reference to the extreme narrowness of the lot or the existence of the driveway and garage along the northerly sideline, the Appellate Division panel stated that the only purported basis for a claim of hardship in the record was that the "oversize" pool was necessary to accommodate a diving board, concluding that "the purported diving board requirement was insufficient to constitute a 'hardship,' " particularly, the court noted, "where the ordinance specifically lays down a 300 square foot limitation on pool size in a [conforming] backyard."

Rejecting the Board's grant of a variance under subsection c(2) of the statute, the panel noted that the aesthetic and safety

advantages to the community also would have been offered by an in-ground pool that complied with the setback and area requirements of the ordinance. Concluding that the Board's action was arbitrary, the panel reversed the Law Division's judgment.

## II

The provision of the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –129, that authorizes the grant of bulk or dimensional variances—non-use variances—is *N.J.S.A.* 40:55D–70(c), which provides in pertinent part as follows:

> c. (1) Where: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to article 8 of this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property, [the board of adjustment shall have the power to] grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship; (2) where in an application or appeal relating to a specific piece of property the purposes of this act would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, [the board of adjustment shall have the power to] grant a variance to allow departure from regulations pursuant to article 8 of this act.
>
> [Footnotes omitted.]

Subsection c(1) describes the grounds on which a bulk variance can be granted based on proof of undue hardship, setting forth three categories of proof that can satisfy the statutory criteria: (a) exceptional narrowness, shallowness or shape of the property; (b) exceptional topographic conditions or physical features uniquely affecting the property; or (c) an exceptional situation uniquely affecting the property or its lawfully existing structures.

Despite the clarity of the statutory language, the undefined term "undue hardship" has been a fertile source of confusion. See *Brandon v. Board of Comm'rs of Montclair,* 124 *N.J.L.* 135, 149, 11 *A.*2d 304 (Sup.Ct.), *aff'd,* 125 *N.J.L.* 367, 15 *A.*2d 598 (E & A 1940) ("The term 'unnecessary hardship' does not lend itself to

precise definition automatically resolving every case."). One manifestation of that confusion has resulted from language in early opinions that appeared to imply that the "hardship" referred to by the statute must be personal to the specific property owner. See *165 Augusta Street, Inc. v. Collins,* 9 *N.J.* 259, 263, 87 *A.2d* 889 (1952) ("It is now settled that under subparagraph (c) ... in order to support the grant of a variance there must be a finding of unnecessary hardship to the individual landowner.").

█ That personal connotation of "undue hardship" appears to have prompted this Appellate Division panel to assume that the basis for petitioner's claim of hardship was the desire to have a diving board in his pool. The court observed that "[w]ere this a 'hardship' c(1) variance, it would have to be shown that the need for an oversize pool, said to be generated primarily to allow use of a diving board, was a hardship sufficient to support the [variances]." Our case law, however, has clarified the point, emphasizing that personal hardship is irrelevant to the statutory standard, and that the correct focus must be on whether the strict enforcement of the ordinance would cause undue hardship because of the unique or exceptional conditions of the specific property. As this Court explained in *Isko v. Planning Board of Livingston:*

> There is no showing in the record of any exceptional narrowness, shallowness, or shape of the hospital tract, or exceptional topographic condition of the land or any other extraordinary physical condition thereof which would cause undue hardship if the height restriction of the zoning ordinance were enforced. Only recently this Court declared that hardship personal to the owner which is unrelated to the physical characteristics of the land is not contemplated by subsection (c) and does not constitute sufficient ground for the granting of a variance under that subsection.
>
> [51 *N.J.* 162, 174, 238 *A.2d* 457 (1968), *abrogated on other grounds, Commercial Realty & Resources Corp. v. First Atl. Properties Co.,* 122 *N.J.* 546, 585 *A.2d* 928 (1991).]

*See also Place v. Board of Adj. of Saddle River,* 42 *N.J.* 324, 331, 200 *A.2d* 601 (1964) ("The board argues that financial hardship is not a reason recognized in law for granting a variance. But in our view this argument is irrelevant in this case because the hardship to which subsection (c) of the statute refers must arise by reason of one of the specified conditions of the property."). *Accord Home*

Builders Ass'n v. Borough of Paramus, 7 N.J. 335, 343, 81 A.2d 753 (1951); Loscalzo v. Pini, 228 N.J.Super. 291, 303, 549 A.2d 859 (App.Div.1988), certif. denied, 118 N.J. 216, 570 A.2d 972 (1989), abrogated on other grounds, Coventry Square, Inc. v. Westwood Zoning Bd. of Adj., 138 N.J. 285, 650 A.2d 340 (1994); Hill Homeowners Ass'n v. Passaic Zoning Bd. of Adj., 134 N.J.Super. 107, 109, 338 A.2d 824 (App.Div.1975). The desire for a diving board, which influenced the applicant's decision to install an eighteen-by-thirty-five-foot pool, diverted the Appellate Division's focus from the size and conditions of the property that constituted the statutorily authorized reasons why the strict enforcement of the ordinance's setback and area provisions could satisfy the undue hardship standard.

A second misconception about the term "undue hardship," not directly germane to this appeal, is the belief that an applicant seeking a variance under subsection c(1) must prove that without the variance the property would be zoned into inutility. See Trinity Baptist v. Louis Scott Holding Co., 219 N.J.Super. 490, 499, 530 A.2d 828 (App.Div.1987) ("Undue hardship involves the underlying notion that no effective use can be made of the property in the event the variance is denied."). That variant of hardship typically has been offered to support the grant of a use variance. See Medici v. BPR Co., 107 N.J. 1, 17 n. 9, 526 A.2d 109 (1987). The misperception that evidence of inability to use property in conformity with the ordinance is essential to the grant of a subsection c(1) hardship variance, however, derives from the period during which use variances could be sought pursuant to either subsection c or d of the predecessor statute, see Commercial Realty & Resources Corp. v. First Atl. Properties Co., 122 N.J. 546, 554–57, 585 A.2d 928 (1991), and traces back to the period prior to the 1948 amendments to the land-use statutes, L. 1948, c. 305, when evidence of undue hardship to support a use variance consisted of proof that the property could not reasonably be adapted to a conforming use. See Bressman v. Gash, 131 N.J. 517, 531, 621 A.2d 476 (1993) (Stein, J., concurring).

■ Accordingly, the principle is now firmly established that "[a] c(1) variance requires proof of the 'positive criteria,' which are predicated on 'exceptional and undue hardship' because of the exceptional shape and size of the lot." *Bressman, supra,* 131 *N.J.* at 522–23, 621 *A.*2d 476. As the Court observed in *Kaufmann v. Planning Board of Warren,* 110 *N.J.* 551, 562, 542 *A.*2d 457 (1988): "Typically, the contention is that the strict enforcement of the zoning ordinance, in view of that property's unique characteristics, imposes a hardship that may inhibit *the extent* to which the property can be used." (quoting *Davis Enterprises v. Karpf,* 105 *N.J.* 476, 493, 523 *A.*2d 137 (1987) (Stein, J., concurring)).

A collateral issue, implicated by the Appellate Division's emphasis on the applicant's ability to have installed a conforming in-ground pool, concerns whether the need for the variance is caused by the exceptional condition of the property or by the size of the structure proposed by the applicant. That issue is highlighted by the comments in the Appellate Division opinion that imply that if the applicant could have constructed a conforming pool then the statutory "hardship" standard cannot be satisfied. That reasoning is flawed, and may find its origins in the early *use* variance cases in which "hardship" typically was proved by demonstrating that the property could not be put to a conforming use. See *Brandon, supra,* 124 *N.J.L.* at 149, 11 *A.*2d 304.

■ In the bulk variance context, however, the statute provides plainly that the causation element that the applicant must satisfy relates to the unique condition of the property. On that point, the statutory language could not be clearer:

(1) Where: (a) *by reason of* exceptional narrowness, shallowness or shape of a specific piece of property, or (b) *by reason of* exceptional topographic conditions ... uniquely affecting a specific piece of property, or (c) *by reason of* an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation ... would result in ... exceptional and undue hardship upon[ ] the developer of such property, [the board of adjustment shall have the power to grant] ... a variance from such strict application of such regulation so as to relieve such ... hardship.

[*N.J.S.A.* 40:55D–70(c) (emphasis supplied).]

Under the statute, what is essential is proof that the need for the variance is occasioned by the unique condition of the property that constitutes the basis of the claim of hardship. See *Place, supra,* 42 *N.J.* at 331, 200 *A.*2d 601 ("[T]he hardship to which subsection c of the statute refers must arise by reason of one of the specified conditions of the property."). That clear demand of the statute does not make irrelevant the size of the structure that the variance is intended to permit. In a given case, the dimensions of a proposed structure may be so unusual or atypical that the applicant will be unable to demonstrate to the board that it is the unique condition of the property that *causes* the need for a variance. Accordingly, in a c(1) variance context, a board of adjustment or a reviewing court should consider whether the structure proposed is so unusually large that its size, rather than the unique condition of the property, causes the need for a variance. Contrary to the Appellate Division's implication, that the proposed structure does not conform to the ordinance is neither decisive nor relevant to the causation question. Obviously, no variance application would be filed if the structure were conforming.

■ Rather, the focus of the board's inquiry should be on whether the unique property condition relied on by the applicant constitutes the primary reason why the proposed structure does not conform to the ordinance. See *Bressman, supra,* 131 *N.J.* at 521, 621 *A.*2d 476 (noting that shallowness of lot created need for rear-yard setback variance). On this record, the applicant's contention was that the exceptional narrowness and small size of his property, in comparison with the minimum width and area requirements of the zoning ordinance, precluded his compliance with the setback and area requirements applicable to swimming pools.

The subsection c(2) variance standard, added to the statute by the Legislature in 1984, *L.* 1984, *c.* 20, provides an alternative ground for the grant of bulk or dimensional variances. Subsection c(2) provides that

> where in an application or appeal relating to a specific piece of property the purposes of this act would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, [the board of adjustment may] grant a variance to allow departure from regulations pursuant to article 8 of this act.

The statute contemplates that even absent proof of "hardship" pursuant to subsection c(1), a bulk or dimensional variance that advances the purposes of the MLUL can be granted if the benefits of the deviation outweigh any detriment. As Justice O'Hern observed in *Kaufmann, supra,* 110 *N.J.* at 563, 542 *A.*2d 457:

> By definition, then, no c(2) variance should be granted when merely the purposes of the owner will be advanced. The grant of approval must actually benefit the community in that it represents a better zoning alternative for the property.

 Whether a dimensional variance is sought under subsection c(1) or c(2), the applicant also must satisfy the familiar negative criteria:

> No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.
>
> [*N.J.S.A.* 40:55D–70(d).]

In *Ward v. Scott,* 11 *N.J.* 117, 126, 93 *A.*2d 385 (1952), this Court characterized the statutory negative criteria as "the fixed and far reaching protective restriction" intended as an essential safeguard to prevent the improper exercise of the variance power. See *Medici, supra,* 107 *N.J.* at 22, 526 *A.*2d 109. In the context of this record, the statutory mandate that the grant of the variance occur "without substantial detriment to the public good" focuses on the impact the variance will have on the specific adjacent properties affected by the permitted deviations from the ordinance. The requirement that the grant of the variance not "substantially impair the intent and the purpose of the zone plan and zoning ordinance" focuses on whether the grant of the variance can be reconciled with the zoning restriction from which the applicant intends to deviate. *Id.* at 21, 526 *A.*2d 109. Unlike use variances, reconciliation of a dimensional variance with the zone plan and zoning ordinance is a relatively uncomplicated issue, and depends

on whether the grounds offered to support the variance, either under subsection c(1) or c(2), adequately justify the board's action in granting an exception from the ordinance's requirements.

Finally, an overriding principle governing judicial review of variance decisions by boards of adjustment is that, assuming an adequate basis in the record for a board's conclusions, deference to the judgment of local zoning boards ordinarily is appropriate. That principle was explained by this Court in *Kramer v. Board of Adjustment of Sea Girt*, 45 *N.J.* 268, 296–97, 212 *A.*2d 153 (1965):

> In these highly controversial and oftentimes debatable zoning cases the courts must recognize that local officials 'who are thoroughly familiar with their community's characteristics and interests and are the proper representatives of its people are undoubtedly the best equipped to pass initially on such applications for variance.' Therefore, the law presumes that boards of adjustment and municipal governing bodies will act fairly and with proper motives and for valid reasons....
>
> Such public bodies, because of their peculiar knowledge of local conditions must be allowed wide latitude in the exercise of delegated discretion. Courts cannot substitute an independent judgment for that of the boards in areas of factual disputes; neither will they exercise anew the original jurisdiction of such boards or trespass on their administrative work. So long as the power exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere. A local zoning determination will be set aside only when it is arbitrary, capricious or unreasonable. Even when doubt is entertained as to the wisdom of the action, or as to some part of it, there can be no judicial declaration of invalidity in the absence of clear abuse of discretion by the public agencies involved.

> [Citations omitted.]

The principle articulated by this Court in *Kramer* reflects a pragmatic assumption that local boards of adjustment ordinarily will not grant variances that would be substantially detrimental to neighboring properties or that are incompatible with the zoning plan, nor will they deny variances where the proofs incontestably establish the need for variance relief and demonstrate no threat to the neighborhood or zone plan. The deference to local boards contemplated by *Kramer* is not intended to be applied rigidly or categorically, and is predicated on the existence of adequate evidence in the record supporting the board's determination either to grant or deny variance relief. Nevertheless, courts ordinarily should not disturb the discretionary decisions of local boards that

are supported by substantial evidence in the record and reflect a correct application of the relevant principles of land use law.

### III

Application of the foregoing legal principles to this record persuades us that the decision of the North Caldwell Board of Adjustment must be sustained. The Board's conclusion that "the proposed pool size was reasonable in scale and fairly typical for such installations" appears to be adequately supported by the record and undoubtedly reflects to some extent the Board's own experience with variance applications for swimming pools. Accordingly, the Board's focus was on whether the exceptional narrowness of the lot, combined with the effect of the existing driveway and garage along the northerly sideyard, rendered the strict enforcement of the setback and land coverage ordinance requirements an undue hardship on the applicant. The Board's conclusion that those unique conditions of Calabrese's property *caused* the need for variance relief is amply supported by the record. The property's rear yard width of 77.9 feet is 22.1 feet narrower than the minimum width permitted by ordinance, and many properties in the immediate vicinity of Calabrese's property are significantly wider than the minimum width. Even with its substandard width, but for the existing garage the pool could have been relocated approximately seven and one-half feet closer to the northerly sideline, decreasing substantially the need for a sideyard variance. If the width of Calabrese's property were conforming—100 feet wide rather than 77.9 feet—the pool could have been set back twelve additional feet from the sideyard and there would have been no need for any side yard setback variance.

Similarly, if the width of the property were conforming rather than substantially undersized, the rear yard area, which governs the permitted size of swimming pools, would be substantially larger than the 4446 square feet calculated by the Board. A rough estimate based on the survey of the property submitted to the Board indicates that if the rear lot line were at least 100 feet

wide, the rear yard area would be in excess of 5700 square feet, with the result that the proposed pool would be approximately eleven percent of the rear yard area. In that context, any need for an area variance would have been *de minimis*.

The need for a four-foot-rear-yard variance for the southerly end of the pool would not appear to be eliminated even if the property's width were conforming. However, the relatively short depth of the property's rear yard—about fifty-seven feet— obviously has been influenced irrevocably by the narrowness of the property. The approximate dimensions of the one-family residential dwelling existing on the property—sixty-four feet in depth by twenty-four feet in width—unquestionably were dictated by the property's unusual narrowness. A residential structure built on a conforming lot could have been constructed with a greater width and less depth, resulting in a wider rear yard and a greater setback for the proposed pool. The Board's conclusion that the property's unusual narrowness and shape justified the grant under subsection c(1) of setback and area variances adequately is supported by the record.

The Board also determined that the dimensional variances could be sustained under subsection c(2), reasoning that the removal of the existing above-ground pool and deck and their replacement with an average-sized in-ground pool is consistent with "promotion of a desirable visual environment" in the Borough and "is found to advance at least the safety and visual purposes of zoning." The Board further concluded that those benefits were not outweighed by any detriment that would result from the grant of the variances. We find that conclusion also is supported by sufficient evidence in the record.

Concerning the negative criteria, the Board considered in its assessment of the effect of the variance on adjacent properties the existence of a substantial evergreen hedge along the southerly sideline, and imposed as a condition of the rear yard setback variance the planting of a six-foot evergreen hedgerow along the rear line to supplement the existing stockade fence. The Board

determined that no dwellings were close enough either to the rear lot line or southerly side line to observe the proposed pool or to be adversely affected by the grant of the variances, and concluded that the grant of the variances were "entirely consistent with the zone plan and zoning ordinance and not in the least bit damaging in that respect." The Board observed that "*any* permission for a variance may have *some* tendency to impair residential character, utility or value. Here there seems to be no such tendency, but even if there were, the tendency must be 'substantial' in order to defeat the variance." We find adequate support in the record for the Board's conclusion that the negative criteria were satisfied.

## IV

Consistent with our recognition that reviewing courts ordinarily should defer to decisions by local boards of adjustment that are adequately supported by the record, *Kramer, supra,* 45 *N.J.* at 296–97, 212 *A.*2d 153, we are fully persuaded that the variances granted by the North Caldwell Board of Adjustment must be sustained. The Board's thorough and comprehensive findings demonstrate a careful adherence to the principle that the grant of subsection c(1) "hardship" variances requires proof that the need for the variances is occasioned by the unique shape, narrowness, shallowness or topography of the property or by any other "extraordinary situation" uniquely affecting the property or structures existing thereon. The proofs before the Board demonstrated that it was not the size of the proposed pool, but rather the unusual narrowness of the applicant's property in relation to the ordinance's minimum width and the width of properties in the vicinity, combined with the existing structures on the property, that constituted the reasons why the setback and area variances were required. Nor did any evidence in the record contradict the Board's findings that the negative criteria were satisfied.

We reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.